NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO E.W., D.W.,
AND K.S.

No. 1 CA-JV 26-0009

FILED 07-02-2026

Appeal from the Superior Court in Maricopa County
No. JD535134
The Honorable David J. Palmer, Judge

**AFFIRMED**

COUNSEL

Eddie W., Mesa
*Appellant*

Arizona Attorney General's Office, Tucson
By Marika J. Hodge
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which
Judge Cynthia J. Bailey and Judge D. Steven Williams joined.

**K I L E Y**, Judge:

¶1            Eddie W. ("Father") appeals the termination of his parental rights to his children, E.W., D.W., and K.S. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2            We view the facts in the light most favorable to affirming the juvenile court's decision. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 479 ¶ 32 (2023).

¶3            Father and Yvette S. ("Mother") had three children in common, all of whom were born between February 2021 and October 2023. Mother also had three children from prior relationships, Gi.S., Ge.S., and Y.S.[1]

¶4            On nine occasions between May 2017 and April 2022, the Department of Child Safety ("DCS") received anonymous reports that Father physically abused Gi.S., including that he "punched [Gi.S.] in the stomach" and "made [Gi.S.] stand until his feet hurt." During this time, Gi.S. was repeatedly seen with bruises, "a swollen lip[,]" and other injuries for which the child offered implausible explanations, such as that he "walked into a wall."

¶5            In September 2022, Gi.S., who was ten years old at the time, arrived at school with injuries "consistent with being hit with a fist[,]" including "a black eye, a cut near his eye, and a swollen lip." The school called the police. Gi.S. told the responding officer that he sustained the injuries when he "ran into a door[.]" Nine-year-old Ge.S. denied any knowledge of how her brother sustained his injuries. When the officer asked Ge.S. "if she or [Gi.S.] were ever hurt by their parents," she replied that "she did not know." After attempting to contact Mother without success, the officer contacted DCS.

¶6            Following the September 2022 report, DCS secured an order for the temporary removal of Gi.S. and Ge.S. Shortly thereafter, DCS filed a petition alleging that Gi.S., Ge.S., Y.S., E.W., and D.W. were dependent as to Mother, alleging that she "failed to protect [Gi.S.] from abuse" and "is unable to safely parent due to domestic violence." DCS also alleged that E.W. and D.W. were dependent as to Father, asserting that he "neglected

_____

[1] Mother's parental rights to all of the children have been terminated. She is not a party to this appeal.

[the] child[ren] and is unwilling or unable to provide proper and effective parental care and control due to domestic violence." DCS further alleged that Father's exercise of "power and control over Mother" rendered the home "unsafe and unfit" for the children.

¶7          At a contested dependency hearing, the juvenile court adjudicated E.W. and D.W. dependent as to Father and all of the children dependent as to Mother. The court entered orders that included requiring Father to undergo a psychological consultation and to attend domestic-violence classes.

¶8          DCS initially attempted an in-home dependency for E.W. and D.W. with Mother as their primary caretaker. In January 2023, however, Mother disclosed to a DCS caseworker that Father had "slapped" her, threatened to take the children, and refused to give her the family's "food vouchers," leaving her unable to purchase food for the children. DCS then helped Mother and the children move in with the children's maternal grandmother. Three days later, however, Mother and the children left the maternal grandmother's home and returned to live with Father. DCS then removed the children from Mother's care and placed them in foster care.

¶9          Father underwent a psychological evaluation with Dr. Heather DeGrote in February 2023. During his interview with Dr. DeGrote, Father reported that violence occurred in his relationships with Mother and with four prior romantic partners, identifying himself as the victim each time. Father also reported that he was homeless and living in his car, explaining that he had been evicted from his last apartment for "nonpayment of rent even though I paid it."

¶10          Dr. DeGrote issued a report in March 2023 in which she diagnosed Father with "moderate" alcohol and cannabis use disorders, an "Unspecified Disruptive, Impulse-Control, and Conduct Disorder[,]" "Spouse or Partner Violence, Physical, Confirmed[,]" "Child Neglect, Confirmed[,]" and "Child Physical Abuse, Suspected[.]" Dr. DeGrote offered a "guarded" prognosis of Father being able to safely parent in the foreseeable future, noting that up to that point he had refused to engage in services and "minimize[d]" the factors that resulted in the dependency. Noting that "[r]esearch suggests individuals with [a] history of unaddressed domestic violence are at increased risk for future domestic violence," she recommended that Father be required to participate in the Nurturing Parenting Program ("NPP") to "learn and demonstrate appropriate discipline[,] develop insight regarding impacts of . . . interpersonal violence . . . and instability on . . . children[,]" and learn

"to manage the expected stressors of parenting in general[.]" Dr. DeGrote also recommended that Father be required to undergo domestic violence counseling, complete substance abuse treatment, submit to random drug testing, and demonstrate "a minimum of 6 consecutive months" of "stable housing and sobriety" before D.W. and E.W. were returned to his care.

¶11        Father began participating in NPP sessions. During one session, Father stated that he was so angry about the dependency proceedings that he might go "on a killing spree[.]" In response, the NPP provider changed the location of the sessions from Father's apartment to a public setting. At subsequent sessions, Father repeatedly complained that DCS had "kidnapped" his children.

¶12        During supervised visits in 2023, Father "yell[ed]" at the case aide and frightened the children by telling them that they were being "poisoned" by their caretakers. At a visit in August 2023, for example, Father yelled at the supervisor, whom he accused of "trafficking [the] children" and warned, "You are all going to pay for what you have done."

¶13        In October 2023, Mother gave birth to K.S., who was determined to have been exposed to marijuana. DCS removed K.S. from the parties' care, placed him in foster care, and filed another dependency petition. The juvenile court later adjudicated K.S. dependent as to both Mother and Father.

¶14        At a meeting with DCS officials in October 2023, Father acknowledged that domestic violence had occurred in his relationship with Mother, which, he stated, occurred when she "attacked" him. He denied, however, any ongoing domestic violence in their relationship. He stated that he "provides punishment" for the children but denied "ever physically harming" them, insisting that "they had harmed themselves." He further told the DCS officials that the children "needed to be returned" and that they would "pay" if the children were not. Father also told them that he "did not need to participate in any services."

¶15        Father's supervised visitation was repeatedly closed out because of his "inconsistent" contact with DCS and the providers. In December 2023, DCS attempted to contact Father to reinstitute supervised visits and to arrange for individual counseling. Father did not respond until January 2024, when he stated that "he would not participate in any services[.]" When, several months later, a DCS representative emailed Father to again discuss his participation in services, Father replied that he

"WILL NOT BE PARTICIPATING IN ANY SERVICE!" and told the aide to "STOP HARSSING [*sic*]" him.

**¶16** In July 2024, Father was convicted of assault after he slapped a coworker.

**¶17** Father resumed supervised visitation with the children in August 2024. DCS staff noted that although Father brought the children healthy food (*i.e.*, "green juice, fruit, and vegetables"), he did not bring enough, and when they returned to their placement they complained of being hungry. On one occasion, he refused the children's request for water. He continued to frighten the children by telling them that they were being "poison[ed.]" Several visits resulted in security becoming involved after Father became "elevated" and "loud" when "communicating with the case aides[,]" on one occasion "berating the staff in front of the children."

**¶18** E.W. and D.W. exhibited concerning behaviors following visits with Father. E.W. began urinating on himself at school, and both E.W. and D.W. displayed aggression toward other children. A daycare provider reported, for example, that E.W. punched one child and "thr[ew] chairs and items at other children[.]" On other occasions, D.W. would get out of bed in the middle of the night and begin doing push-ups, explaining that Father "told him he has to get stronger."

**¶19** By the end of 2024, Father's supervised visitation was closed out due to his "consistent aggressive demeanor[,]" failure to provide adequate food during visits, and lack of engagement with services. DCS also consulted with Dr. Tasha Haggar, a psychologist, to determine when and whether Father's visitation should be reinstated in light of the "extremely aggressive behaviors" that the children "demonstrate . . . following visits."

**¶20** In May 2025, DCS moved to terminate both parties' parental rights on nine- and fifteen-months' out-of-home placement grounds. *See* A.R.S. § 8-533(B)(8)(a), (c). Despite moving to terminate his rights, DCS nonetheless resumed Father's supervised visitation. During visits, Father continued to behave in a belligerent manner, "yelling" at both DCS staff and the children and accusing DCS staff of kidnapping the children. DCS staff noted that at one visit, Father refused D.W.'s request for a drink of water. When E.W. offered to give D.W. water, Father refused permission, stating "[D.W.] can't have water, he's on punishment."

**¶21** In August 2025, almost three years after the dependency began, Father completed a "Nurturing Fathers" program through a local

organization to which DCS had previously referred him. Father also began individual counseling in October 2025.

¶22 Meanwhile, after reviewing relevant records and consulting with DCS officials, Dr. Haggar concluded that Father's visitation should be suspended because the children had "increased emotional/behavioral issues following visitation." Suspending visitation until "after [F]ather has made progress in therapy" would, Dr. Haggar opined, be "in the children's best interest" by allowing them to "gain increased stability." Based on Dr. Haggar's recommendation, the court suspended visitation in October 2025.

¶23 The court held a termination adjudication hearing over two days roughly a month apart in October and November 2025. As relevant here, Victoria Forbis, the DCS case manager, testified that Father had not "remedied the circumstances that caused his children [to be in] out of home care[.]" She explained that Father "hasn't demonstrated any behavioral changes" during the proceedings, refused to undergo counseling to "address the domestic violence . . . [and] the impact that has on the children[,]" and had not even "acknowledged the reason why the children are in care." Noting that Father was currently on probation following his conviction for assault, Forbis expressed concern about Father's ability to manage his anger as well as his "hyper-focus on disciplining the children." She also testified that termination of parental rights was in the best interest of the children because after being "in care for 37 months," the children needed "permanency[,]" "stability[,]" and "a normal life."

¶24 Father waived counsel and represented himself at the hearing. In his testimony, he denied any responsibility for the aggressive behavior that D.W. and E.W. exhibited after visits with him, stating, "I have no effect on the kids' behavior." Insisting that he does not even "yell in front of the kids[,]" Father denied the possibility that the aggressive behaviors E.W. and D.W. exhibited after supervised visits could be attributed to his own conduct. "It's not logical[,]" Father stated, to suggest that "a child" would "change their whole mental state" after seeing "somebody" for mere "minutes or hours."

¶25 Father expressly denied causing the injuries to Gi.S. in September 2022 that led to the initiation of the dependency case. When asked how the ten-year-old boy sustained those injuries, Father replied that "he got it from his sister[,]" who was nine at the time. Father acknowledged that he "discipline[d]" Gi.S. when the boy was in his care, but stated, "I was never trying to hurt [him]."

**¶26** Referring to himself as a "nutritionist," Father insisted that he provided healthy food for the children and denied withholding food for improper reasons. He further referred to the food the children were given by their placement as "poison." When asked, "What do you consider poison," he replied, "Anything that I don't give to my kids." Father appeared unconcerned about the children's complaints of hunger after visits with him, stating, "[K]ids are always going to ask for more food."

**¶27** Father acknowledged having had "altercations" with Mother, but insisted that he "was not the initiator." He explained that he had taken steps to prevent future violence in the home by "getting away from" Mother. When asked if being required to "participate in services" made him "ang[ry]," Father replied, "Of course not." When asked if he spoke of going "on a killing spree" due to his negative feelings over the dependency case, Father replied, "I don't recall."

**¶28** In closing, Father argued that he had done "everything that [he] was told to do" and "deserve[d] to have [his] kids back."

**¶29** After taking the matter under advisement, the court issued its ruling terminating Father's parental rights to E.W., D.W., and K.S. The court found that DCS had proven grounds for termination under both the nine- and fifteen-months' out-of-home care grounds by "clear and convincing evidence." The court found that Father had both been "unable" and "substantially neglected or willfully refused to remedy the circumstances that cause[d] the children to be in an out-of-home placement." The court also found that DCS had "proven, by a preponderance of the evidence," that termination was in the best interests of the children. Father appealed.

**¶30** We have jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

**¶31** Although parents have a fundamental right to the custody and control of their children, that right is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The parental relationship may be terminated if the juvenile court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and further finds, by a preponderance of the evidence, that termination is in the child''s best interests. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022) (citations omitted).

**¶32**　　　　When reviewing an order terminating parental rights, we view evidence in the light most favorable to sustaining the juvenile court's findings. *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008) (citation omitted). We will affirm a termination order absent an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). "[W]e accept the superior court's factual findings if supported by reasonable evidence, giving due regard to that court's unique ability to weigh the evidence and assess witness credibility." *In re E.M.*, No. 1 CA-JV 24-0153, 2026 WL 1030435 at *2, ¶ 10 (App. 2026).

**¶33**　　　　Father filed a brief *in propria persona*, having chosen to represent himself on appeal as he did in the proceedings below. Father's brief fails to provide any citations to the record or legal authority as required by Arizona Rule of Civil Appellate Procedure ("Rule") 13(a)(7). Ordinarily, an appellant's failure to comply with applicable court rules would be treated as a waiver of appellate review. *Ramos v. Nichols*, 252 Ariz. 519, 522, ¶ 9 (App. 2022) (holding that appellant "waived any issues he may have wished to submit for this court's review" by "fail[ing] to provide a bona fide and reasonably intelligent effort to comply with Rule 13"). But because "the best interests of [a] child trump the consequences ordinarily imposed for violations of the rules," *Nold v. Nold*, 232 Ariz. 270, 273, ¶ 10 (App. 2013), we decline to apply waiver here. Despite the deficiencies in Father's brief, we will address the merits of his arguments to the extent we are able to. Any arguments that are not sufficiently developed to permit review, however, are waived. *See MacMillan v. Schwartz*, 226 Ariz. 584, 591, ¶ 33 (App. 2011) ("Merely mentioning an argument in an appellate opening brief is insufficient.").[2]

**¶34**　　　　In his briefing, Father repeatedly asserts that the children were healthy "when . . . in [his] care[.]" Father challenges, in other words,

---

[2] Referring to the children as "property," Father argues that he "did not consent to any one taken [*sic*] my property" and denies that "anyone ha[s] authority over me." Although it is not entirely clear, Father appears to raise a jurisdictional challenge to the termination order. He does not, however, make clear whether he challenges the juvenile court's subject matter jurisdiction or its exercise of personal jurisdiction over him. Moreover, he asserts no specific facts that might support a jurisdictional challenge; he does not assert, for example, that he resides outside the state, nor does he allege any service defects. By failing to develop or explain his jurisdictional challenge, Father has waived it. *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 234, ¶ 14 n.6 (App. 2011).

the initial dependency finding. Because the juvenile court issued a subsequent order terminating rights, the dependency is no longer in effect. *See Dep't of Child Safety v. Stocking-Tate*, 247 Ariz. 108, 114, ¶ 14 (App. 2019) ("[E]ach new [juvenile court] order necessarily replaces the last[.]"). Because the dependency order is no longer in effect, we reject Father's challenge to it as moot. *In re Dependency as to G.K.*, 258 Ariz. 323, 326, ¶ 12 (App. 2024) (declining to consider, as moot, challenge to dependency order that "has no effect on the parties").

**¶35** Father asserts that he has "accomplished everything" that had been asked of him and has "been proactive" in "following [DCS's] recommendation[s] to regain custody." We construe this as an argument that the juvenile court's finding of grounds for termination was not supported by the evidence.

**¶36** Although the court found grounds for termination under both Subsection (8)(a) and Subsection (8)(c) of A.R.S. § 8-533(B), we address only the latter because it is dispositive. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002) ("If [the] evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds.").

**¶37** To terminate parental rights on fifteen-months' out-of-home placement grounds, Subsection (8)(c) of Section 8-533(B) requires the court to find that (1) the child has been in "an out-of-home placement for a cumulative total period of fifteen months or longer[,]" (2) DCS "made a diligent effort to provide appropriate reunification services[,]" (3) the parent has been "unable to remedy the circumstances that cause the child to be in an out-of-home placement[,]" and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). Father does not dispute that the first two conditions were satisfied. He does not, in other words, dispute that E.W., D.W., and K.S. were in an out-of-home placement for over fifteen months, nor does he deny that DCS offered him appropriate reunification services. We therefore affirm, as unchallenged, the court's finding that the first two conditions set forth in Subsection (8)(c) of Section 8-533(B) were satisfied. *See Crystal E. v. Ariz. Dep't of Econ. Sec.*, 241 Ariz. 576, 577-78, ¶ 5 (App. 2017) (affirming juvenile court's unchallenged findings of grounds for termination under A.R.S. § 8-533(B)(8)(c)).

**¶38** Although Father contends that he completed "everything" DCS asked of him, the record refutes this assertion. Father was referred to

a raft of services by DCS, and not only failed to complete most of them but was actively hostile to DCS's attempts to engage with him. During supervised visits, Father routinely failed to bring enough food for the children and frightened them by telling them that they were being "poisoned." He denied water to a thirsty child as a form of punishment. He consistently behaved in an aggressive manner toward DCS staff, and after the visits, the children exhibited similarly aggressive behavior. The court ultimately suspended Father's visits, accepting Dr. Haggar's opinion that the visits were adversely affecting the children. Although Father eventually began individual counseling in August 2025 – almost two and a half years after Dr. DeGrote recommended it – Father made little to no therapeutic progress. In his testimony at the hearing, Father accepted no responsibility for his actions and exhibited no understanding of the impact his negative behavior had on the children. Record evidence thus supports the juvenile court's conclusion that Father was "unable to remedy the circumstances that cause[d] the child[ren] to be in out-of-home placement," and that there is a "substantial likelihood that [Father] will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). The juvenile court did not abuse its discretion in finding grounds for termination.

¶39        Father maintains that the children have not been well cared-for since being removed from his care, asserting, "[m]y offspring and property have experienced health issues while in placement[.]" He contends that he has "evidence" in the form of "photos" that show the children's "neglect and inadequate care in their current placement."

¶40        Because his rights have been terminated, Father lacks standing to challenge the appropriateness of the children's placement. *Antonio M. v. Ariz. Dep't of Econ. Sec.*, 222 Ariz. 369, 371, ¶ 2 (App. 2009) ("Once the court had determined severance was in [child's] best interests and terminated [father's] parental rights, he could no longer challenge [child's] placement."). And even if we were to construe Father's argument as an assertion that termination was not in the children's best interests, Father would be entitled to no relief. Reasonable evidence in the record supports the court's determination that termination was in the children's best interests. At the time of the adjudication hearing, E.W. and D.W. had been in foster care for over three years, while two-year-old K.S. had been in foster care his entire life. As Forbis testified (and Father does not dispute), achieving stability and permanency was in their best interests. *Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 571-72, ¶¶ 5, 10 (App. 2018) (affirming juvenile court's determination that termination was in the best interests of children who "had been in care for nearly three years" and would "continue

languishing in foster care for an indefinite period of time absent termination" (quotation modified)); *Matter of Appeal in Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994) ("Leaving the window of opportunity for remediation open indefinitely is not . . . in the child's . . . best interests."). Moreover, as detailed above, the record reveals numerous instances of physical abuse of children in Father's care, of Father being unable and/or unwilling to provide for the children's physical and emotional needs, and of Father's refusal to acknowledge, much less address, the issues that prevent him from appropriately parenting the children. Insofar as Father asks us to weigh this evidence against the placement's alleged shortcomings, we will not re-weigh the evidence. *Mary Lou C.*, 207 Ariz. at 47, ¶ 8. Father has shown no error in the juvenile court's ruling terminating his parental rights to E.W., D.W., and K.S.

## CONCLUSION

**¶41**        We affirm.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:         JR